the FSA (eighth cause of action), defendants argue that because plaintiffs were not parties to the FSA, they lack standing to assert this claim. Plaintiffs respond that they bring this claim as third-party beneficiaries of the FSA, asserting that they part of the class of persons for whose benefit the agreement was made. For reasons discussed below with regard to the claim of breach of contract (FSA), the court does not decide this issue at this time.

As an additional basis for seeking dismissal of the claim of negligent interference with the FSA (ninth cause of action), defendants argue that Ohio law governs the FSA-related claims, and that Ohio does not recognize a cause of action for negligent interference with contract. Because the court finds that all the tortious interference claims must be dismissed because of the alter ego and agency allegations, the court does not decide which state's law applies to the claim of negligent interference with the FSA.

2.  The breach of contract claims

Defendants contend that the breach of contract claims (the second and seventh causes of action) must be dismissed for lack of subject matter jurisdiction. Defendants claim that the plaintiffs lack standing to bring the claim of breach of the FSA (seventh cause of action), and that the court lacks jurisdiction over the claim of breach of the LOA (second cause of action) because that claim must be arbitrated and because CNF is not EWW's successor.

a.  breach of FSA

In the 4thAC, plaintiffs allege that EWA "failed to observe its implied and explicit covenants of good faith and fair dealing" arising under the FSA by deliberately failing to provide "sufficient manpower and resources to become qualified and capable of conducting its operations in compliance with FAA governing statutes and regulations," thereby breaching its obligations under the FSA. As indicated above with regard to the tortious interference (FSA) claims, plaintiffs assert that the EWA pilots were third-party beneficiaries of the FSA. Defendants argue, however, that plaintiffs lack standing to bring the claim of breach of the FSA, because they were not the intended beneficiaries of the agreement.

California requires that an alleged third-party beneficiary be an intended beneficiary.

13

Bancomer, S.A. v. Superior Court, 44 Cal. App. 4th 1450, 1458 (1996) (contracting parties must have intent to benefit third party and such intent must appear in the contract). On this point, Ohio law is to the same effect. See TRINOVA Corp. v. Pilkington Bros. P.L.C., 638 N.E. 2d 572, 577 (Ohio 1994); Anderson v. Olmstead Utility Equip., Inc., 573 N.E. 2d 626, 631 n.5 (Ohio 1991). Relying on Ohio law, defendants assert that plaintiffs can qualify as third-party beneficiaries only if they can show that EWA intended to benefit them directly by negotiating and executing the FSA, and that EWA intended to discharge a preexisting duty to plaintiffs by entering into the FSA. Defendants contend that plaintiffs do not allege these elements in the 4thAC, and that the evidence shows that EWA did not intend to benefit plaintiffs by entering into the FSA.

In support, defendants cite to the Declarations of Gerard Trimarco ("Trimarco"), E. Tazewell Ellet ("Ellett"), and Sheldon Kline ("Kline"). Trimarco is employed by UPS, and was formerly employed by CNF. He was co-President of EWA as of 1998, and CEO as of 2000. He remained CEO of EWA until December 2004. He states that in August 2001, the FAA demanded a meeting with EWA officials. At the meeting on August 11, 2001, the FAA told Trimarco and the others present that unless EWA agreed to a grounding of its flight operations until certain safety issues had been resolved, the FAA would revoke EWA's air carrier certificate. Trimarco chose the grounding.

Trimarco then negotiated the terms of the interim settlement agreement ("ISA") with the FAA, on behalf of EWA, and signed it in Dayton, Ohio, on August 13, 2001. The ISA obligated the parties to negotiate a final settlement agreement (the FSA) no later than 30 days from the date of the ISA. Trimarco states that during the negotiation for the ISA, there was no mention or discussion of the ISA's effect on or benefit to any individual EWA employee or any group or class of EWA employees. He claims that he did not negotiate or execute either the ISA or the FSA to benefit specifically the EWA pilots or any other group of EWA employees.

Ellett is an attorney who has represented EWA since 1998. He was present at the August 11, 2001, meeting between EWA representatives and the FAA. He confirms that

14

the FAA presented EWA with the option of agreeing to a shut-down or having its certificate revoked, and that the parties' discussion of the ISA did not include any reference to or mention of the ISA's effect on or benefit to any group of EWA employees. Ellett states that when he negotiated and executed the ISA, he did not consider its potential effect on any group of EWA employees. Ellett also negotiated and executed the FSA, and asserts that there was no discussion during the negotiation or execution of the FSA regarding its effect on or benefit to any group of EWA employees.

Kline is a partner at the law firm of Thelen Reid & Priest, LLP, counsel for the corporate defendants herein. He has served as outside counsel for EWA since 1998. He participated in the "effects" bargaining with ALPA and EWA in August and September 2001, following the shut-down of EWA by the FAA. He states that he was aware that EWA was negotiating the terms of the FSA during August and September 2001, but he did not participate in those negotiations. He asserts that he never presented any ALPA representative with a draft of the FSA. He recalls that the subject of the FSA did come up during the effects bargaining, but says it was only after the FSA had been executed on September 20. He claims that no EWA bargainer or ALPA representative stated at any meeting that the FSA was intended to benefit the EWA pilots specifically or any other class of EWA employees.

In opposition, plaintiffs argue that they are third-party beneficiaries to the FSA because they are in the class of persons for whose benefit the agreement was made. They claim that they were third-party beneficiaries for two reasons – because the FSA was allegedly the result of an FAA investigation prompted by the crash of an Emery plane in Sacramento in February 2000, and was also the result of "safety concerns" raised by plaintiffs; and because the FSA indicates that it was intended to remedy "[a]lleged [v]iolations of 49 U.S.C. § 40101, et seq., [the Federal Aviation Act] and 14 C.F.R. § 43, 119, and 121." Plaintiffs contend that the Federal Aviation Act was intended by Congress to improve air safety and to prevent or reduce aviation accidents, and that the Act and its regulations create an actionable duty on the part of FAA personnel to persons in the zone

15

of danger – whether air passengers, carrier pilots, and personnel.

Plaintiffs also request, pursuant to Federal Rule of Civil Procedure 56(f), that they be permitted to conduct discovery in order to oppose the statements in the Trimarco, Ellett, and Kline declarations – specifically, those statements relied upon by defendants to establish that Ohio law should be applied to the claims of breach of contract (FSA) and intentional and negligent breach of contract (FSA), and to establish that the FSA was not intended to benefit the EWA pilots. Plaintiffs contend that they need discovery to determine where the FSA was negotiated, and whether it was negotiated to benefit the EWA pilots or any other group of EWA employees.

Although plaintiffs' argument that they were the intended beneficiaries of the FSA is less than compelling, the court finds that the motion to dismiss the breach of FSA claim must be DENIED. It is true, as defendants argue, that plaintiffs provide no competent evidence establishing that the FSA was the direct result of the February 2000 plane crash. Moreover, even if the crash had prompted the FAA's investigation, that fact would not compel the conclusion that the EMERY pilots were the intended beneficiaries of the FSA, as opposed to all other EWA employees, or as opposed to EWW's customers or the general public. The asserted "indication" that the FSA was intended to remedy "alleged violations" of the FAA and its regulations is based solely on the fact that the caption of the FSA is designated, "In the Matter of: Alleged Violations of 49 U.S.C. § 40101, et seq." This is not an indication that the intended purpose of the FSA was to benefit the EWA pilots.

On the other hand, plaintiffs are correct in asserting that they have not had the opportunity to conduct discovery on this issue. In particular, it would be unfair for the court to find that plaintiffs lacked standing based on defendants' declarations, but without allowing plaintiffs an opportunity to obtain information in discovery to oppose defendants' evidence. The court notes, in addition, that while plaintiffs refer to this as a Rule 56(f) motion, it is actually primarily a motion for jurisdictional discovery, as defendants appear to be seeking dismissal of the FSA-related claims for lack of standing, under Federal Rule of

16

Civil Procedure 12(b)(1).[5]

      b.    breach of LOA

In the second cause of action, plaintiffs allege breach of contract (the LOA) against EWW and against CNF as alter ego <u>or</u> as successor to EWW's liability (based on the indemnity provision in a Stock Purchase Agreement under which UPS acquired EWW stock from CNF in 2004). Defendants argue that the court lacks jurisdiction over this claim because the LOA provides for mandatory arbitration, which provision defendants assert is enforceable under the Federal Arbitration Act.

The LOA states that it is an agreement between EWW and the airline pilots in the service of EWA, as represented by ALPA. Paragraph 2 of the LOA provides as follows:

> The parties shall meet to exchange data needed for the calculation of block hour totals, percentages and proportions as well as to establish procedures to verify compliance with this Letter of Agreement. In the event that the parties are unable to agree upon procedures or if a dispute arises, all such matters, including remedy, shall be referred to Permanent Umpire, Richard Kasher, who shall promptly hear and resolve the dispute. In the event that Umpire Kasher shall become unwilling or unable to continue in this capacity, the parties will agree upon Umpire George Nicolau.

Defendants contend that the Ninth Circuit interprets such agreements broadly, and that under Ninth Circuit rulings an agreement such as this – providing that "all" disputes over "compliance with this Letter of Agreement" "shall be referred" to binding arbitration – should be arbitrated. Defendants argue that the only job for the court is to determine whether a valid agreement to arbitrate exists, and if it does, whether the agreement encompasses the disputed issue. Defendants contend that the agreement is valid, and that

---

[5] Plaintiffs also request leave to conduct discovery to establish the meaning of the arbitration provision in the LOA, to determine whether the System Board actually found that the grounding of EWA in August 2001 was caused by a "force majeure," and to oppose defendants' arguments regarding choice of law. This request is denied. As explained below, the court finds that the LOA requires arbitration. Further, there is no dispute that the System Board found that the August 2001 grounding was caused by a "force majeure." In addition, the choice-of-law issue is not dispositive with regard to the FSA-related claims, as the court finds that the tortious interference claims must be dismissed based on the allegations of agency and alter ego liability, while resolution of the breach of contract claim will turn in part on whether plaintiffs can show they were the intended beneficiaries of the FSA – an element required for third-party beneficiary breach of contract claims under both Ohio and California law.

17

it clearly encompasses the claim of breach of the LOA.

Defendants also assert that ALPA has taken the position that all disputes under the LOA must be arbitrated, and that the System Board arbitrator previously found so as well. Defendants contend that plaintiffs are bound by ALPA's commitments to the LOA, because ALPA is or was plaintiffs' statutory bargaining agent.

In opposition, plaintiffs argue that the arbitration clause does not apply to the claim of breach of the LOA. They argue that ¶ 2 of the LOA merely states that the parties will work out the procedural details of exchanging data under ¶ 2, and will arbitrate if they are unable to agree on these details. Plaintiffs claim that they have not raised any issue relevant to ¶ 2 in their claims in this lawsuit, noting that the procedure for measuring the proportion of cargo flow by EWA compared with other carriers is not at issue. Instead, they argue, the LOA claim raises issues wholly unrelated to block hours – specifically, whether plaintiffs incur benefits as a party or as a third-party beneficiary, whether plaintiffs are bound by ALPA's promise in the LOA not to assert claims against EWW; and whether EWW is excused from breach of the LOA because of the FAA order.

Plaintiffs assert that the language of the LOA does not reflect the parties' intent to arbitrate disputes and to be bound by the arbitration decisions that resolve such disputes. Plaintiffs claim that an EWA representative stated before the System Board in April 2002 that it was EWA's position that the jurisdiction of the umpire specified in ¶ 2 "is to decide disputes under paragraph two of that letter with respect to the application of the formula and not issues with respect to the violation of the agreement itself." Plaintiffs do not dispute that ¶ 2 of the LOA is a "valid agreement to arbitrate" under the FAA. They assert only that their claim for breach of the LOA is viable because the LOA's language does not "unambiguously" reflect the parties' intent to arbitrate all disputes.

The court finds that the motion to compel arbitration of the breach of LOA claim must be GRANTED. The Federal Arbitration Act has established a rule of contract construction favoring arbitration, and "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v.

18

Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). Additionally, "ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration." Mastrobono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62 (1995) (citing Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ., 489 U.S. 468, 476 (1989)).

The court is persuaded by the evidence showing that ALPA has taken the position that all disputes under the LOA must be arbitrated, and that the arbitrator so found as well. While it is true that the language of the LOA is somewhat ambiguous, the court must resolve this ambiguity in favor of arbitration.

The court finds further that CNF is not EWW's successor. Plaintiffs allege that CNF is a "successor" to EWW's alleged liability based on an indemnity provision in a stock purchase agreement under which a subsidiary of UPS purchased EWW stock from CNF in 2004. Plaintiffs also assert that a statement in one of CNF's filings with the Securities and Exchange Commission – that CNF agreed to "indemnify, defend, and hold harmless" UPS with respect to any claims relating to the CBA – proves CNF's status as successor to EWW's liability. In their opposition to defendants' motion, plaintiffs concede that CNF is not a "successor" as that word is defined in the legal context. Nevertheless, they argue that CNF is a successor "as a practical matter" because CNF assumed EWW's liability for breach of the LOA or for any other claim for which EWW might be found liable.

As defendants have pointed out, however, the stock acquisition did not extinguish EWW, and EWW as a legal entity did not change by virtue of the stock purchase. In addition, an indemnity provision does not create successor liability by imputing the indemnitee's liability to the indemnitor; rather, such a provision simply allows the indemnitee to recover from the indemnitor on becoming liable. CC-Calif. Plaza Assocs. v. Paller & Goldstein, 51 Cal. App. 4th 1042, 1054 (1996).

A "successor," by contrast, "succeeds" to the responsibilities of another. The general rule is that when one corporation sells or transfers all its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor unless 1) there is an express or implied agreement of assumption, 2) the transaction amounts to a

19

consolidation or merger of the two corporations, 3) the purchasing corporation is a mere continuation of the seller, or 4), the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts. Ray v. Alad Corp., 19 Cal. 3d 22, 28 (1977). In the event that one of those exceptions applies, the successor is the purchaser or transferee, not, as plaintiffs would have it here, the seller or transferor.

3.  The unjust enrichment claim

In the tenth cause of action, plaintiffs assert that CNF and EWW received a "substantial financial benefit from reduced expenses" as a result of EWA's cessation of flight operations and use of subcontractors to carry EWW's freight, and that plaintiffs and the "CNF class" incurred financial damages as a result. Defendants assert that the unjust enrichment claim must be dismissed because it is preempted by the RLA, and because plaintiffs fail to plead facts supporting the claim.

Defendants contend that the unjust enrichment claim is preempted because plaintiffs' claimed losses are based on their loss of employment, and their right of employment was governed directly by the CBA. Defendants argue that the alleged unjust gain conferred on the corporate defendants therefore arises from a breach of the CBA, which means that any unjust enrichment claim will require interpretation and application of the CBA.

Plaintiffs assert, however, that the unjust enrichment claim can be resolved without interpreting the CBA. They cite two cases – Consolidated Rail Corp. (Conrail) v. Railway Labor Executives' Ass'n, 491 U.S. 299, 305 (1989); and Hawaiian Airlines v. Norris, 512 U.S. at 256 – for the proposition that the RLA's mechanism for resolving minor disputes does not preempt causes of action to enforce rights that are independent of the CBA.

The court finds that the motion must be GRANTED. The unjust enrichment claim explicitly incorporates all preceding allegations of the 4thAC, including that an express contract governs the relationship between the parties. Unlike the plaintiff in Hawaiian Airlines, who alleged a state law claim of retaliatory discharge because of whistleblower activities, the plaintiffs in the present case allege loss of "employment opportunity" of a

20

value comparable to the "benefit" conferred on defendants by the cessation of EWA's flight operations. Because plaintiffs' employment at EWA was governed by contract – the CBA – any claim of loss of "employment opportunity" caused by the shutdown of EWA would require an analysis and interpretation of the CBA to ascertain the nature and extent of plaintiffs' employment rights. Accordingly, the claim must be dismissed.

As an alternative basis for seeking dismissal, defendants argue that under the facts alleged, plaintiffs cannot maintain a cause of action for unjust enrichment. The elements of a claim of unjust enrichment are receipt of a benefit and unjust retention of the benefit at the expense of another. Ghirardo v. Antonioli, 14 Cal. 4th 39, 51 (1996); Lectrodryer v. SeoulBank, 77 Cal. App. 4th 723, 726 (2000).[6]

Defendants argue that plaintiffs cannot plead that they "conferred a benefit" on any corporate defendant for which they were not compensated. Indeed, defendants note, rather than claiming that they conferred a benefit on defendants, plaintiffs allege elsewhere in the 4thAC that the corporate defendants lost money. Defendants also argue that the purpose of an unjust enrichment claim is not to compensate a plaintiff for loss or damage suffered by him – the essence of the claim in the 4thAC – but to compensate that plaintiff for the benefit he has conferred on the defendant.

Plaintiffs contend that they have properly pled unjust enrichment under California law. They assert that the 4thAC alleges that CNF and EWW received a substantial financial benefit by saving about $350 million from breaching the CBA and LOA, while plaintiffs lost employment opportunity of comparable value. According to plaintiffs, the "injustice" here is that defendants received this benefit only by violating federal air safety laws and regulations, causing the FAA to ground EWA and purportedly creating an excuse

---

[6] Defendants argue that Ohio law applies to this cause of action, because Ohio has a stronger interest in applying its law than does California. To establish a claim of unjust enrichment under Ohio law, a plaintiff must demonstrate a) a benefit conferred by the plaintiff on the defendant, b) knowledge by the defendant of this benefit, and c) retention of the benefit by the defendant under circumstances where it would seem unjust to do so. Johnson v. Microsoft Corp., 834 N.E. 2d 791, 799 (Ohio 2005). Because the court finds that the unjust enrichment claim is preempted by the RLA, the court does not decide the issue of choice of law.

21

for breach of the CBA and LOA.

The court agrees with defendants that plaintiffs have not stated a claim for unjust enrichment, as they have not alleged that they themselves conferred a benefit for which they were not compensated, on either CNF or EWW. Because the court finds that this claim is preempted, however, amendment would be futile.

4. The § 17200 claim

In the eleventh cause of action, plaintiffs allege that the actions of the corporate defendants, including the acts defendants performed as alter egos of each other, constituted illegal and unfair business acts and practices within the meaning of Business & Professions Code § 17200. Plaintiffs allege further that as a result of these violations of § 17200, defendants have unjustly enriched themselves at the expense of the class members, and should be required to disgorge their illegal gains and make full restitution to the class members. In their motion to dismiss, defendants contend that the unfair competition claim is preempted by the RLA, and also fails to state a claim.

Plaintiffs assert that the CBA and the LOA gave them a vested interest in future employment with EWA. They claim that the CBA gave plaintiffs "the right to perform 'all present and future revenue flying performed by Emery Worldwide Airlines' with some exceptions;" and that the LOA provided the pilots with the right to require EWW to give an increasing amount of its cargo to EWA because EWW agreed that it would "reduce the proportion of scheduled block hours flown by airline contractors (other than EWA and Ryan)." Plaintiffs contend that by virtue of the LOA, they were "guaranteed" work because EWW was obligated to ship air cargo via EWA, and EWA was obligated to use plaintiffs as pilots.

Plaintiffs assert that the "effect" of the CBA and the LOA was that they obtained, in exchange for agreeing to the other terms of the CBA, a "valuable right to an employment opportunity that was not subject to any condition precedent – other than events that were not under Defendants' control." Thus, plaintiffs assert, they had a "vested interest," which they lost when EWA stopped flying, and it is this "vested interest" that they seek to recover

22

under the § 17200.

The court finds that the motion must be GRANTED. Because plaintiffs assert that the alleged "unlawful" and "unfair" conduct giving rise to the § 17200 claim was a violation of their contract right to employment opportunities – which necessarily requires interpretation and application of the CBA – the § 17200 claim is preempted by the RLA. In order to establish that they are entitled to recover under § 17200, plaintiffs must show that the CBA entitled them to continuing employment during the period of time up to the December 2001 cessation of operations of EWA, and must then show a breach of the CBA entitling them to payment of wages they would have earned but for defendants' alleged breach of the CBA.

As an alternative basis for dismissal, the court finds that this cause of action fails to state a claim. A UCL action is "an equitable action by means of which a plaintiff may recover money or property obtained from the plaintiff . . . through unfair or unlawful business practices," and is not "an all-purpose substitute for a tort or contract action." Cortez v. Purolator Air Filtration Prods. Co., 23 Cal. 4th 163, 173 (2000). Section 17200 establishes three types of "unfair competition" – unlawful, unfair, and fraudulent acts or practices. Schnall v. Hertz Corp., 78 Cal. App. 4th 1144, 1153 (2000).

"Unlawful" practices are those practices that are prohibited by law, whether "civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." Saunders v. Superior Court, 27 Cal. App. 4th 832, 839 (1994). Plaintiffs do not allege that defendants have engaged in any practice forbidden by law. Nor have plaintiffs stated a claim for "unfair" or fraudulent business practices. An "unfair" business practice is "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 186-87 (1999). A fraudulent business practice is one that is likely to deceive the public. Bank of the West v. Superior Court, 2 Cal. 4th 1254, 1267 (1992). Plaintiffs do not allege any conduct that threatens or harms

23

competition, or that is likely to deceive the public.

In addition, to the extent that plaintiffs seek damages, the § 17200 claim is improper, as damages are not available for a violation of § 17200. Cortez, 23 Cal. 4th at 173-74. Plaintiffs assert that they seek restitution or disgorgement. An order for restitution is one "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken." Kraus v. Trinity Mgmt Servs., Inc., 23 Cal. 4th 116, 126-27 (2000). Here, however, the 4thAC does not allege that defendants obtained money from the plaintiffs through an unjust business practice. In seeking "restitution" of their "vested" property interests, by which they mean the right to future employment with EWA, plaintiffs appear to be simply seeking damages.

**CONCLUSION**

In accordance with the foregoing, the court hereby GRANTS the motion to compel arbitration, and GRANTS the motion to dismiss in part and DENIES it in part. The motion to dismiss is granted as to all causes of action except the seventh cause of action for breach of the FSA. The dismissal is WITH PREJUDICE.

Because the court must consider evidence submitted by the parties in ruling on the motion to dismiss the breach of the FSA claim, and because plaintiffs have not had an opportunity to conduct discovery on the question whether the contracting parties intended to benefit the plaintiffs, the court will permit the parties 60 days in which to conduct discovery. Defendants may then file a motion for summary judgment on that issue only, no later than September 20, 2006. The motion shall be noticed for hearing on October 25, 2006.

**IT IS SO ORDERED.**

Dated: June 16, 2006

_____
PHYLLIS J. HAMILTON
United States District Judge

24